Jennie Lee Anderson (SBN 203586)
**ANDRUS ANDERSON LLP**
155 Montgomery Street, Suite 900
San Francisco, California 94104
Telephone:  415-986-1400
jennie@andrusanderson.com

W. Daniel "Dee" Miles, III (*pro hac vice to be filed*)
**BEASLEY, ALLEN, CROW,**
**METHVIN, PORTIS & MILES, P.C.**
272 Commerce Street
Montgomery, Alabama 36104
Telephone: 334-269-2343
Dee.Miles@beasleyallen.com
*Counsel for Plaintiffs and the Proposed Classes*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN DOE 1 AND JOHN DOE 2, in their individual capacity and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>    v.<br><br>META PLATFORMS, INC.,<br><br>        Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs, John Doe 1 and 2, in their individual capacity and on behalf of the other members of the below-defined nationwide and statewide classes seek to represent (collectively, the "Class"), hereby allege against Defendant Meta Platforms, Inc. ("Meta" or "Facebook" or "Defendant"), upon personal knowledge as to themselves and their own acts, and as to all other matters upon information and belief and based upon the investigation made by the undersigned attorneys, as follows:

### NATURE OF THE CASE

1.      Meta, and its previous iteration, Facebook, have been the subject of repeated investigations into their data-mining practices and use of personal information of unsuspecting users. So much so that

lawmakers in the United States Congress have sought (and taken) testimony from its CEO Mark Zuckerberg, on various topics including Meta's privacy protections, over multiple days.

2.      This litigation involves one of the most egregious misuses of private and protected health information for corporate gains by one of the world's largest social platforms.

3.      A patient's communications with medical providers are protected for a multitude of reasons. Some theorize that privacy is a basic human right with intrinsic value. Others take a practical view: if health information were not protected, patients would not seek treatment. Regardless of one's view on *why* personal health information is private, all agree that it is private.  Except, apparently, Meta.

4.      Meta collects data through many mechanisms, one of which is through its "Meta Pixel."

5.      Generally speaking, a "pixel" is a piece of software code used by website owners/hosts to monitor activity on their websites. Ostensibly, the data is then utilized by the website owner/host to improve website performance and potentially bring in new customers. The information can and often is also used to determine the efficacy of advertising – whether new customers are coming to the website.

6.      Like other pixels, Meta Pixel is code embedded within a vast number of websites; indeed, it is believed that the Meta Pixel is embedded within multiple millions of websites – largely retail and/or customer service websites – where it has been in use for a decade or more.

7.      In addition to tracking user information purportedly used to improve website functionality, these retail data sources allow Meta to track the online actions of individuals, including shopping trends and purchase history, search and other browser information, and what websites an individual user visits, how often they visit, what they click on a given website, and any information input into the website.

8.      Meta consolidates the information on an individual level and uses this information to sell its targeted advertising options for a profit – more than 95% of Meta's profits are from advertising revenue.

9.      What was unknown until recent disclosure was Meta Pixel's presence in both public healthcare provider websites and private, patient portals of healthcare providers that require login.

10.      Meta Pixel, in both healthcare sources, gathers private information (IP address, email, and name, at a minimum), but the patient portal Pixel garners even more personal information – appointment

information, treating provider information, and potentially even diagnoses-related information from text box entries.

11.     In other words, Meta Pixel purposefully gathers, unbeknownst to patients and without permission or authority, protected health information and individually identifiable health information.

12.     In addition, Meta's (formerly known as Facebook) terms and conditions contained language promising its users that Facebook "require[s]" other websites to have the "lawful rights to collect, use, and share your data before providing any to us" through the Meta Pixel. Despite that healthcare providers may have the right to collect data from patients, these providers do not and cannot verify that they have unfettered authority to share the personal health information of patients with third parties, like Meta.

13.     Aware that it was collecting personal health information, Meta ignored the requirements of the Health Insurance Portability and Accountability Act ("HIPAA") and continued to gather this personal health information without proper authorization, then used it for its own benefit, in violation of its agreements with Meta platform users.

14.     This collection of personal health information was received by Meta and stored for use in selling targeted advertising efforts to Meta's paying customers. These practices were occurring on and through the websites and patient portals of healthcare providers all across the country, including those visited by Plaintiffs, John Doe 1 and 2, and members of the Class.

15.     For example, John Doe 1 is a patient of Novant Health, a North Carolina healthcare provider ("Novant").  John Doe 1's wife, Jane Doe, created a patient portal login, called "MyChart," a repository for the entire family's health information, including John Doe 1 and their minor children.

16.     John Doe 1 has an uncommon health diagnosis for which he sought and received treatment at Novant. His personal health information, through Meta Pixel's presence in Novant's MyChart system, gathered John Doe 1's diagnosis information so that targeted advertising relating to his diagnosis appeared in his Facebook newsfeed. Neither Jane nor John Doe 1 was aware that Novant had placed Meta Pixel on the website, which allowed Meta to gather protected health information and personally identifiable information for the company's corporate gains.

**PARTIES**

17.     Plaintiff John Doe 1 is a resident of Charlotte, North Carolina, in Mecklenburg County.

18.     Plaintiff John Doe 1 is a Meta platform user and patient of Novant whose personal health information was contained on Novant's MyChart system. Plaintiff John Doe 1's health information was a part of the MyChart system during the time that Meta Pixel was embedded within the portal.

19.     By letter dated August 12, 2022, Jane Doe, Plaintiff John Doe 1's wife, was advised that the MyChart portal through which she accessed the entire family's health information and scheduled care appointments, including John Doe 1's information, was automatically transmitted to Meta.

20.     As a result, Plaintiff John Doe 1 received unsolicited, targeted advertisements specifically referencing his personal health information available on Novant's MyChart patient portal.

21.     Plaintiff John Doe 2 is a resident of Raleigh, North Carolina, in Wake County.

22.     Plaintiff John Doe 2 is a Meta platform user and patient of WakeMed whose personal health information was contained in WakeMed's patient portal, "MyChart" during the time that Meta Pixel was embedded within the portal.

23.     By letter on or about October 11, 2022, Plaintiff John Doe 2 was advised that the MyChart portal through which John Doe 2 had access to and did view his personal health information, including using the patient portal for scheduling, text entries, physician searches, and other health-related information, was automatically transmitted to Meta.

24.     As a result, Plaintiff John Doe 2 received unsolicited, targeted advertisements on his Facebook account specifically referencing his personal health information available on WakeMed's MyChart patient portal.

25.     Defendant Meta Platforms, Inc., formerly known as Facebook, Inc. ("Meta" or "Facebook"), is incorporated in Delaware with its principal place of business at 1 Hacker Way, Menlo Park, California 94025 in San Mateo County.

26.     Facebook announced it changed its name to Meta in October of 2021.  The change was effectuated through a name change rather than creation of a separate legal entity and merger. Meaning, therefore, Meta is Facebook and successor liability is not at issue.[1]

## JURISDICTION AND VENUE

27.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because the amount in controversy, exclusive of costs and interest, exceeds a sum or value of $5,000,000, there are more than 100 members in the proposed Class, and a member of the Class is a citizen of a different state than Defendant Meta.

28.     Subject matter jurisdiction also exists in this Court pursuant to 28 U.S.C. § 1331 over the Federal Wiretap Act claim in this action, 18 U.S.C. § 2510, *et seq.*

29.     Supplemental jurisdiction exists over the state law claims in this action pursuant to 28 U.S.C. § 1367 because the state law claims form part of the same case or controversy as the federal claim over which this Court has original jurisdiction.

30.     Personal jurisdiction exists over Meta because its principal place of business is located within the State of California, it has continuous and systematic business contacts with the State of California, and because a substantial part of the events and conduct giving rise to the claims herein occurred within the State of California.

31.     Venus is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred, Meta is a resident of this District, and Facebook's Terms[2] include a venue selection provision requiring claims be brought in this Court.

---

[1]  The Delaware Secretary of State: Division of Corporations lists Meta Platform, Inc.'s date of incorporation as July 29, 2004, which is the date of TheFacebook, Inc.'s original incorporation. TheFacebook, Inc. executed a name change to Facebook, Inc. in 2005.
[2]  Some documents and websites discussed herein refer to Facebook rather than Meta because they were created prior to the name change.  Others, like those documents specifically referencing the Facebook platform, have retained that name after the name change.  For clarity, the name in a particular article, website, or document is retained throughout this Complaint. Because, however, the change from Facebook to Meta was in name *only*, both names are the same legal entity.

**DIVISIONAL ASSIGNMENT**

32.     Assignment is proper to the San Francisco Division of this District under Local Rule 3-2(c)-(e), because Meta is headquartered in San Mateo County, where a substantial part of the events giving rise to Plaintiffs' claims occurred.

**FACTS COMMON TO THE CLASS AND ALL COUNTS**

**I.     Federal Protection of Personal Health Information and Individually Identifiable Information**

33.     When passing HIPAA, enacted in 1996, Congress acknowledged "The provision of high-quality health care requires the exchange of personal, often-sensitive information between an individual and a skilled practitioner. Vital to that interaction is the patient's ability to trust that the information shared will be protected and kept confidential."[3] And further recognized that "Privacy is a fundamental right."[4]

34.     HIPAA protections were put in place, at least in part, because of a recognition that advances in the use of electronically stored information caused concern for patients when it came to protecting their personal health information. These rights were so important that, despite a comment requesting delayed implementation, Congress declined, responding "adopting national standards to protect the privacy of individually identifiable health information is an urgent national priority."[5]

35.     To effectuate these protections, HIPAA's Privacy Rule, located at 45 C.F.R. Part 160, restricts a provider's ability to use or disclose the protected health information of patients and provides certain rights to patients relating to their records.

36.     Under 45 C.F.R. § 164.502, a health care provider or business associate of a health care provider "may not use or disclose 'protected health information' except as permitted or required by" the HIPAA Privacy Rule.

---

[3] Standards for Privacy of Individually Identifiable Health Information, 65 FR 82462-01.

[4] *Id.*

[5] *Id.*

37.     Under 45 C.F.R. 160.103, the Privacy Rule defines "protected health information" or PHI as "individually identifiable health information" that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium."

38.     Under 45 C.F.R. § 160.103, the Privacy Rule defines "individually identifiable health information" as "a subset of health information, including demographic information collected from an individual" that is (1) "created or received by a health care provider;" (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual;" and (3) either (a) identifies the individual; or (b) with respect to which there is a reasonable basis to believe the information can be used to identify the individual."

39.     Under 45 C.F.R. § 164.514, the HIPAA de-identification rule states that "health information is not individually identifiable only if" (1) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination" or (2) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed: Names … Medical record numbers; … Account numbers … Device identifiers and serial numbers; … Web Universal Resource Locators (URLs); Internet Protocol (IP) address numbers; … and any other unique identifying number, characteristic, or code." In addition, the covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."

40.     Under 42 U.S.C. § 1320d-6, any "person [individual … or a corporation] who knowingly and in violation of this part—(1) uses or causes to be used a unique health identifiers; [or] (2) obtains individually identifiable health information relating to an individual … shall be punished" by fine or, in certain circumstances, imprisonment, with increased penalties for "intent to sell, transfer, or use individually identifiable health information for commercial advantage[.]" The statute further provides that a "person … shall be considered to have obtained or disclosed individually identifiable

health information … if the information is maintained by a covered entity … and the individual obtained or disclosed such information without authorization."

41.     Guidance from HHS instructs health care providers that patient status is protected by HIPAA. In Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule, HHS sets out:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data. … *If such information was listed with* health condition, *health care provision* or payment data, *such as an indication that the individual was treated at a certain clinic,* then this information would be PHI.[6]

42.     In its guidance for Marketing, HHS further instructs:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, *covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list.*[7]

43.     HHS has previously instructed that HIPAA covers patient-status alone:

a. "The sale of a patient list to a marketing firm" is not permitted under HIPAA. 65 Fed. Reg. 82717 (Dec. 28, 2000);

b. A covered entity must have the individual's prior written authorization to use or disclose protected health information for marketing communications," which would include disclosure of mere patient status through a patient list. 67 Fed. Reg. 53186 (Aug. 14, 2002);

c. It is a HIPAA violation "if a covered entity impermissibly disclosed a list of patient names, addresses, and hospital identification numbers." 78 Fed. Reg. 5642 (Jan. 25, 2013); and

d. Hospitals are only permitted to identify patient status without express written authorization

---

[6]     https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf. At 5 (emphasis added).

[7] https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf

to "maintain a directory of individuals in its facility" that includes name, location, general condition, and religious affiliation when used or disclosed to "members of the clergy" or "other persons who ask for the individual by name." 45 C.F.R. § 164.510(1). Even then, patients must be provided an opportunity to object to the disclosure of the fact that they are a patient in the facility. 45 C.F.R. § 164.510(2).

44.     There is no HIPAA-exception or requirement for the Internet or online patient portals.

45.     In light of federal law requiring its protection, Plaintiffs and the Class have a reasonable expectation of privacy in their personal health information and individually identifiable information.

**II.     Meta Breached Its Contract with Plaintiffs and the Class**

     **a.   Meta's Promises to Users, Including Plaintiffs, and the Class**

46.     Meta users on the Facebook platform have a binding, written contract with Meta. These users' binding contract with Meta includes the Meta Terms of Service and Meta Data Policy.

47.     Meta's Terms of Service incorporates the Meta Data Policy.

48.     Meta states in its Terms of Service, "You can learn about how we collect and use your data in our Data Policy."

49.     Every Meta user on the Facebook platform is legally deemed to have agreed to the Terms, Data Policy, and Cookie Policy via a checkbox on the sign-up page, and the Terms, Data Policy, and Cookie Policy are binding upon Meta and its Facebook users.

50.     The Meta Data Policy, as of on or about April 19, 2018,[8] expressly provides that Meta "requires" businesses that use the Meta Pixel "to have lawful rights to collect, use, and share your data before providing any data to [Facebook]."

---

[8] Prior to the Data Policy change on or about this date, there was no mention of requiring, or even seeking, lawful rights to collect, use, or share any data.

> **Information from partners.**
> Advertisers, app developers, and publishers can send us information through Meta Business Tools they use, including our social plug-ins (such as the Like button), Facebook Login, our APIs and SDKs, or the Meta pixel. These partners provide information about your activities off of our Products—including information about your device, websites you visit, purchases you make, the ads you see, and how you use their services —whether or not you have an account or are logged into our Products. For example, a game developer could use our API to tell us what games you play, or a business could tell us about a purchase you made in its store. We also receive information about your online and offline actions and purchases from third-party data providers who have the rights to provide us with your information.
>
> Partners receive your data when you visit or use their services or through third parties they work with. We require each of these partners to have lawful rights to collect, use and share your data before providing any data to us. Learn more about the types of partners we receive data from.
>
> To learn more about how we use cookies in connection with Meta Business Tools, review the Facebook Cookies Policy and Instagram Cookies Policy.

51.     Despite advising users, like Plaintiffs and the Class, that it requires the lawful right to collect, use, and share data, Meta does not "require" medical providers to have lawful rights to share patient data before gathering the information.

**b.  Meta's Business Tool Language Does Not Satisfy the Promises to Users of Meta's Social Media Platforms[9]**

52.     Instead of fulfilling this promise, Meta merely includes a provision in its form contract creating an unenforced "honor system" for publishers, stating that, by using the Meta Business Tools, the publisher "represent[s] and warrant[s] that [it has] provided robust and sufficient prominent notice to users regarding the Business Tool Data collection, sharing, and usage."

---

[9] Meta Business Suite, a free tool utilized to manage advertising on Meta's social media platforms, purports to "centralize Facebook, Instagram, and messaging tools in one place" and allows advertisers to post on "both Facebook and Instagram without switching accounts." Meta Business Suite, https://www.facebook.com/business/tools/meta-business-suite. It is believed that, for this and other reasons, targeted advertising is occurring across all of Meta's social medial platforms, not solely Facebook.

3. Special Provisions Concerning the Use of Certain Business Tools

   a. This section applies to your use of Business Tools to enable Facebook to store and access cookies or other information on an end user's device.

   b. You (or partners acting on your behalf) may not place pixels associated with your Business Manager or ad account on websites that you do not own without our written permission.

   c. You represent and warrant that you have provided robust and sufficiently prominent notice to users regarding the Business Tool Data collection, sharing and usage that includes, at a minimum:

      i. For websites, a clear and prominent notice on each web page where our pixels are used that links to a clear explanation (a) that third parties, including Facebook, may use cookies, web beacons, and other storage technologies to collect or receive information from your websites and elsewhere on the Internet and use that information to provide measurement services and target ads, (b) how users can opt-out of the collection and use of information for ad targeting, and (c) where a user can access a mechanism for exercising such choice (e.g., providing links to: http://www.aboutads.info/choices and http://www.youronlinechoices.eu/).

      ii. For apps, a clear and prominent link that is easily accessible inside your app settings or any privacy policy and from within any store or website where your app is distributed that links to a clear explanation (a) that third parties, including Facebook, may collect or receive information from your app and other apps and use that information to provide measurement services and targeted ads, and (b) how and where users can opt-out of the collection and use of information for ad targeting.

   d. In jurisdictions that require informed consent for storing and accessing cookies or other information on an end user's device (such as but not limited to the European Union), you must ensure, in a verifiable manner, that an end user provides all necessary consents before you use Facebook Business Tools to enable the storage of and access to Facebook cookies or other information on the end user's device. (For suggestions on implementing consent mechanisms, visit Facebook's Cookie Consent Guide for Sites and Apps.)

53.     In reality, Meta does not verify that publishers have obtained adequate consent, as is required by their agreement with users, including Plaintiffs and the Class.

54.     Instead, the Meta Pixel is available to any publisher willing to embed the code in their website, whether private or not, and regardless of their privacy policies, consent processes, or the nature of their business – Defendant's contract with healthcare providers does not even mention HIPAA.

    **c. How Meta Pixel Operates, Gathers Information, and is Profitable for Meta**

55.     Meta maintains profiles on users of its social medial platforms that include users' real names, locations, email addresses, friends, locations, relationship status, likes, and communications, among other things, that Meta associates with personal identifiers including IP addresses, cookies, and device identifiers.

56.     Meta uses a variety of tracking tools, but one of its most powerful tools, particularly when it comes to Meta's advertising revenue, is Meta Pixel (also known as Facebook Pixel), which launched in 2015.

57.     In 2007, Meta began monetizing its platform by launching "Facebook Ads," proclaiming it to be a "completely new way of advertising online" that would allow "advertisers to deliver more tailored and relevant ads."[10] Meta Pixel was touted as "a new way to report and optimize for conversions,

---

[10] *Meta, Facebook Unveils Facebook Ads* (Nov. 6, 2007), https://about.fb.com/news/2007/11/facebook-unveils-facebook-ads/

build audiences and get rich insights about how people use your website."[11]

58.    Meta offers several advertising options based on the type of audience the advertiser wants to target. A few options include targeting "Core Audiences," "Custom Audiences," "Look Alike Audiences," and an even more granular approach within the audiences called "Detailed Targeting."[12] As the website address indicates, each of Meta's advertising tools are based on targeting users, called an "audience," based on their personal data, including, among other things, geographic location, demographics (e.g., age, gender, education, job title, relationship status), interests (e.g., preferred foods, movies), connections (e.g., to a particular event or Facebook page), and behaviors (e.g., purchases, device usage, and pages visited).[13] This target audience can be created by Meta, the advertiser, or a combination of both.

59.    Sales of targeted advertising has been extremely successful for Meta, due, in large part, to Meta's ability to target people at a granular level because it can gather such a large array of personal information across websites and social media platforms. "Among many possible target audiences, [Meta] offers advertisers, [for example,] 1.5 million people 'whose activity on Facebook suggests that they're more likely to engage with/distribute liberal political content' and nearly seven million Facebook users who 'prefer high-value goods in Mexico.'"[14]

60.    Given the highly detailed level of data used to target specific users, it is no surprise that Meta's advertising segment quickly became its most successful business unit with millions of companies and individuals utilizing Meta's advertising services.

61.    By 2009, Meta derived $761 million through its advertising business. The business growth was exponential – just ten years later, Meta's revenue from advertising would increase by nearly 100

---

[11] Cecile Ho, *Announcing Facebook Pixel* (Oct. 14, 2015),
https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/

[12] Meta, Help your ads find the people who will love your business,
https://www.facebook.com/business/ads/ad-targeting.

[13] Meta, Facebook IQ, Audience Insights, https://www.facebook.com/business/insights/tools/audience-insights?ref=fbb_choose_audience.

[14] Natasha Singer, *What You Don't Know About How Facebook Uses Your Data* (Apr. 11 2018),
https://www.nytimes.com/2018/04/11/technology/facebook-privacy-hearings.html.

times.

62.     Meta's revenue is derived almost entirely from selling targeted advertising that appears on its social media platforms, targeting platform users and targeting all Internet users on non-Meta sites that integrate Meta Pixel on their websites.

63.     Facebook Business is the division that provides advertising services to developers. Facebook Business and the advertising tools it provides to developers are focused on trade and commerce.

64.     The Meta Pixel, a product for Facebook Business, is a "piece of code" that lets developers "measure, optimize and build audiences for . . . ad campaigns."[15]

65.     The Meta Pixel is an invisible 1x1 web bug that Meta makes available to web-developers to help track ad-driven activity from Meta and others on their website.

66.     Key features of the Meta Pixel include its ability to help developers:

   a. "Measure cross-device conversions" and "understand how your cross-device ads help influence conversion";

   b. "Optimize delivery to people likely to take action" and "ensure your ads are shown to the people most likely to take action"; and

   c. "Create custom audience from website visitors" and create "dynamic ads [to] help you automatically show website visitors the products they viewed on your website – or related ones."

67.     Meta derives substantial revenue from selling targeted advertising aimed at custom and lookalike audiences.  It is able to do so because it aggregates data gathered by the Meta Pixel, and other data gathered from the users of its social media platforms, matching all the information to the platform user.  The combination is an extremely granular database constructed of private information and used by Meta to sell advertising.

68.     Meta describes the Meta Pixel as "a snippet of Javascript code" that "relies on Facebook cookies, which enable [Facebook] to match … website visitors to their respective Facebook User accounts."

---

[15] https://www.facebook.com/business/learn/facebook-ads-pixel.

69.     Meta further explains "How the Facebook Pixel Works"[16]

> ## How the Facebook pixel works
>
> When someone visits your website and takes an action (for example, buying something), the Facebook pixel is triggered and reports this action. This way, you'll know when a customer took an action after seeing your Facebook ad. You'll also be able to reach this customer again by using a custom audience. When more and more conversions happen on your website, Facebook gets better at delivering your ads to people who are more likely to take certain actions. This is called conversion optimization.

70.     Meta also provides instructions to set up the Pixel:

> ## Setting up the Facebook pixel
>
> If you have access to your website's code, you can add the Facebook pixel yourself. Simply place the Facebook pixel base code (what you see when you create your pixel) on all pages of your website. Then add standard events to the pixel code on the special pages of your website, such as your add-to-cart page or your purchase page. For full step-by-step instructions on adding the Facebook pixel to your site, visit the Help Center.
>
> Many people need the help of a developer to complete this step. If that's the case, simply email your Facebook pixel code to them, and they can easily add it to your site.
>
> ### Create your Facebook pixel to send to your developer, or install it yourself.
>
> [ Go to Ads Manager ]

71.     For a company or advertiser, once Meta Pixel is set up on a website, it tracks users as they navigate through the website and logs which pages are visited, buttons clicked, the specific information entered in forms, as well as "optional values" set by the website.[17]

72.     Meta Pixel tracks this data from the website's usage, regardless of whether the user is logged into Facebook.

**d.   Meta Encourages Companies to Use Pixel, Allowing Meta to Gather a Wide Range of Information**

73.     Meta's advertising, driven by Meta Pixel, is profitable, but it is more profitable the more data it collects and the more websites within which it is embedded.

---

[16] *Id.*

[17] Meta Pixel (2022), https://developers.facebook.com/docs/meta-pixel/

74.      To ensure the pixel gathers the most data, Meta recommends the Pixel code be placed early in the coding for a webpage/website to ensure the user will be tracked:

### Installing The Pixel

To install the pixel, we highly recommend that you add its base code between the opening and closing `<head>` tags on every page where you will be tracking website visitor actions. Most developers add it to their website's persistent header, so it can be used on all pages.

Placing the code within your `<head>` tags reduces the chances of browsers or third-party code blocking the pixel's execution. It also executes the code sooner, increasing the chance that your visitors are tracked before they leave your page.

75.      By executing the code sooner, Meta has designed the Pixel such that Meta receives the information about patient actions on the medical provider's website and/or patient portal contemporaneously.

76.      Because of its tracking capabilities, Meta Pixel was described as a means for website developers/owners to track information about internet traffic on their websites, including tracking when a user takes any action, including "adding an item to their shopping cart or making a purchase":



Once you've set up the Meta Pixel, the Pixel will log when someone takes an action on your website. Examples of actions include adding an item to their shopping cart or making a purchase. The Meta Pixel receives these actions, or events, which you can view on your Meta Pixel page in Events Manager. From there, you'll be able to see the actions that your customers take. You'll also have options to reach those customers again through future Facebook ads.

77.      But for Meta, the Pixel acts as a conduit of information; it sends the information it collects to Meta through scripts running in the user's internet browser. The information is sent in data packets labeled with PII, including the user's IP address.

78.     If the user has a Facebook account, the collected data is linked by Meta to that Facebook account through various mechanisms, including third-party cookies, Facebook Cookies, or through matching identifying information collected through the Meta Pixel on the website.

79.     When it comes to healthcare providers, specifically, as soon as a patient takes any action on a webpage which includes the Meta Pixel—such as clicking a button to register, login, or logout of a patient portal or to create an appointment—Meta's source code commands the patient's computing device to re-direct the content of the patient's communication to Meta while the exchange of the communication between the patient and the medical provider is still occurring.

80.     By design, Meta receives the content of a patient's patient portal sign-in communication immediately *after* the patient clicks the log-in button and *before* the medical provider receives it.

81.     In *all* cases, the content of the patient's portal and appointment communications are re-directed to Meta while the communications are still occurring.

82.     These include registration, login, logout, appointment set up/request, clicking links within the patient portal (such as to call a provider), and any text-box type entries or messages and the entire content of those entries.  These can and do include things relating to conditions and treatments for health issues/concerns.

83.     The cookies that Meta identifies patients with include, but are not necessarily limited to, cookies named: c_user, datr, fr, and _fbp.

84.     The c_user cookie is a means of identification for Facebook users. The c_user cookie value is the Facebook equivalent of a user identification number. Each Facebook user account has one—and only one—unique c_user cookie. Facebook uses the c_user cookie to record user activities and communications.

85.     A skilled computer user can obtain the c_user cookie value for any Facebook user by (1) going to the user's Facebook page, (2) right-clicking on their mouse, (3) selecting 'View page source,' (4) executing a find (CTRL-F) function for "fb://profile," and (5) copying the number value that appears after "fb://profile" in the page source code of the target Facebook user's page.

86.     It is even easier to find the Facebook account associated with a c_user cookie: one simply needs to log-in to Facebook, and then type www.facebook.com/#, with # representing the c_user cookie

identifier. For example, the c_user cookie value for Mark Zuckerberg is 4. Logging in to Facebook and typing www.facebook.com/4 in the web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck.

87.     The Facebook datr cookie identifies the patient's specific web browser from which the patient is sending the communication. It is an identifier that is unique to the patient's specific web browser and is therefore a means of identification for Facebook users and Facebook tracks each and every datr cookie identifier associated with each of its users.

88.     Meta purports to "hash" personal information, but through its matching and identification processes, it uses the personal information to connect the online and patient portal activity to the specific Facebook account.

89.     This matching utilizing personal health information is purposeful and intentional so that Meta can sell its targeted advertising at the most granular and personal level, making the embedding of Meta Pixel on healthcare provider websites and within patient portals highly profitable for Meta.

90.     Further, a Facebook user can obtain a redacted list of all datr cookies associated with his or her Facebook account from Facebook.

91.     Any Facebook user can view the specific datr cookie identifiers that Facebook has associated with their account by using the Facebook Download Your Information tool.

92.     The Facebook fr cookie is an encrypted combination of the c_user and datr cookies.[18]

93.     The Facebook _fbp cookie is a Facebook identifier that is set by Facebook source code and associated with Defendant's use of the Meta Pixel. The _fbp cookie is a Facebook cookie that masquerades as a first-party cookie to evade third party cookie blockers and share data more directly between a medical provider and Facebook.

> **e.  Despite Knowing Meta Pixel Gathers Personal Health Information, Meta Publicly Acknowledged that Health-Based Advertising is Inappropriate.**

---

[18] *See* Facebook Tracking Through Social Plug-ins: Technical Report prepared for the Belgian Privacy Commission, Mar. 27, 2015, available at https://securehomes.esat.kuleuven.be/~gacar/fb_tracking/fb_pluginsv1.0.pdf.

94.     Meta was aware that incorporating Meta Pixel onto hospital websites would result in the Pixel gathering personal health information from Plaintiffs and the Class.

95. On November 9, 2021, Facebook announced that it was removing the ability to target users on "topics people may perceive as sensitive, such as options referencing causes, organizations, or public figures that relate to health[.]"[19]

96. Facebook's announcement was a public relations success:

> Reuters published a story headlined "Facebook plans to remove thousands of sensitive ad-targeting options" and lead the story with a sentence about Facebook's "plans to remove detailed ad-targeting options that refer to 'sensitive' topics, such as ads based on interactions with content around … health[.]"[20]

97.     Other news sources published similar articles.

98.     Despite these public declarations, no alterations were made to Meta Pixel's embedded in healthcare provider websites and patient portals and did not alter the collection processes for gathering information from those private healthcare sources.

99.     Instead, the changes only applied to user's interactions *within* the Meta platform.

## CLASS ACTION ALLEGATIONS

100.    Plaintiffs file this as a class action on behalf of themselves and the following classes:

> **Nationwide Class:** All persons who are current or former patients of any medical provider in the United States with web properties through which Meta acquired patient activity relating to medical provider websites or patient portals, appointments, phone calls, and communications associated with patient portal users, for which neither the medical provider nor Meta obtained a HIPAA consent, or any other valid consent, for the sharing, gathering, or use of information subject to the HIPAA Privacy Rule.

> **North Carolina Subclass:** All persons residing in North Carolina who are current or former patients of any medical provider in the United States with web properties through which Meta acquired patient activity relating to medical provider websites or patient portals, appointments, phone calls, and communications associated with patient portal users, for which neither the

---

[19] https://www.facebook.com/business/news/removing-certain-ad-targeting-options-and-expanding-our-ad-controls

[20] https://www.reuters.com/technology/facebook-removes-target-options-advertisers-some-topics-2021-11-09/

medical provider nor Meta obtained a HIPAA consent, or any other valid consent for the sharing, gathering, or use of information subject to the HIPAA Privacy Rule.

**Meta social media platform Subclass:** All users of Meta's social media platforms who are current or former patients of any medical provider in the United States with web properties through which Facebook acquired patient activity relating to medical provider websites or patient portals, appointments, phone calls, and communications associated with patient portal users, for which neither the medical provider nor Meta obtained a HIPAA consent, or any other valid consent for the sharing, gathering, or use of information subject to the HIPAA Privacy Rule.

101.    Excluded from the Class are the Court and its personnel and the Defendant and its officers, directors, employees, affiliates, legal representatives, predecessors, successors and assigns, and any entity in which any of them have a controlling interest.

102.    Plaintiffs reserve the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

103.    The proposed Class meets the criteria for certification under Federal Rules of Civil Procedure Rule 23(a), (b)(2), 23(b)(3), and (c)(4).

104.    Previous publicly-filed documents confirm the Meta Pixel has been implemented on at least 664 healthcare provider websites with millions of patients. Accordingly, the members of the Class are so numerous that joinder is impracticable. Class members may be identified from Defendant's records.

105.    Common questions of law and fact exist and predominate over questions affecting individual members of the Class, including, but not limited to, the following:

a.   Whether the Meta Pixel is designed to send individually identifiable information to Meta (formerly Facebook);

b.   Whether the Meta (formerly Facebook) Terms and Privacy Notice are valid contracts with Class Members;

c.   Whether Meta breached the provision in its contract with Class Members that states that Meta (formerly Facebook) will require "each of these partners to have lawful rights to collect, use and share your data before providing any data to us."

d. Whether Meta failed to act in good faith in performing under its contract with Class Members;

e. Whether Meta failed to require medical providers to have lawful rights to share patient data with Meta before deploying the Meta Pixel;

f. Whether Meta acquired the content of patient communications;

g. Whether the Meta Pixel's presence and use on medical provider websites where it discloses actions that patients take relating to patient portals, appointments, and phone calls to their medical providers is highly offensive;

h. Whether Meta's acquisition of the content of communications between patients and their medical providers occurred contemporaneous to their making;

i. Whether Meta breached its contract with users;

j. Whether Class Members possess a legally protected interest in their personal health information;

k. Whether Class Members maintained a reasonable expectation of privacy when providing their personal health information to their healthcare providers and when communicating with their healthcare providers online;

l. Whether Meta's actions, as described above, constituted a serious invasion of privacy that was an egregious breach of social norms, such that the breach was highly offensive to a reasonable person;

m. Whether Class Members are entitled to damages and/or restitution, and if so, the method of computing damages and/or restitution.

n. Whether the information at issue has economic value; and

o. Whether Meta unjustly profited from its collection of personal health information through the Meta Pixel being embedded in healthcare provider websites and patient portals.

106.    Plaintiffs are members of the putative Classes and the claims asserted by Plaintiffs are typical of the claims of the members of the putative Classes as the claims arise from the same wrongful conduct by Facebook and the relief sought is common.

107.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and

have retained counsel that are competent and experienced in class action litigation. Plaintiffs' interests do not conflict with the interests of the other members of the putative Classes that they seek to represent. The Classes' interests will be fairly and adequately protected by Plaintiffs and their counsel.

108.    A class action is superior to any other available means for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. Further, as the damages or other financial detriment suffered by Plaintiffs and other members of the Classes are relatively small compared to the burden and expense that would be required to individually litigate their claims against Meta, it would be impracticable for the Class members to individually seek redress from Meta for Meta's wrongful conduct. This class action presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## STATUTE OF LIMITATIONS TOLLING

109.    Any applicable statutes of limitation have been tolled by Defendant's knowing and active concealment of the misrepresentations and omissions alleged herein. Through no fault or lack of diligence, Plaintiffs and members of the Class were deceived and could not reasonably discover Defendant's deception and unlawful conduct.

110.    Plaintiffs and members of the Class did not discover and did not know of any facts that would have caused a reasonable person to suspect that Defendant was acting unlawfully and in the manner alleged herein.

111.    As alleged herein, the representations made by Meta were material to Plaintiffs and members of the Class at all relevant times. Within the time period of any applicable statutes of limitation, Plaintiffs and members of the Class could not have discovered through the exercise of reasonable diligence the alleged wrongful conduct.

112.    Defendants had exclusive knowledge that Healthcare Defendants' websites incorporated Meta Pixel yet failed to disclose that by interacting with the Meta Pixel-enabled websites that Plaintiffs' and Class members' sensitive medical information would be collected, used, and stored by Meta.

113.    At all times, Defendant is and was under a continuous duty to disclose to Plaintiffs and

members of the Class the true nature of the disclosures being made and the lack of an actual "requirement" before the data was shared with it.

114.     Defendant knowingly, actively, affirmatively and/or negligently concealed the facts alleged herein. Plaintiffs and members of the Class reasonably relied on Defendant's concealment.

115.     For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Defendant's concealment, and Defendant is estopped from relying on any statutes of limitations in defense of this action.

<div align="center">

**CAUSES OF ACTION**

**<u>FIRST CAUSE OF ACTION</u>**

**BREACH OF CONTRACT**

**All classes**

</div>

115.     Plaintiffs re-allege and incorporate by reference all the allegations contained above.

116.     Plaintiffs and Class Members agreed to Meta's Terms, Data Policy, and Cookies Policy at the time of signing up for an account by clicking a box required to join Facebook.

117.     As this is method of agreement is considered a binding contract, Plaintiffs were bound by the Meta Terms, Data Policy, and Cookies Policy.

118.     Plaintiffs and Class Members substantially performed their responsibilities under the contract.

119.     One of Meta's promises under the Data Policy, included that Meta (formerly Facebook) required its "partners" to have "lawful rights to collect, use, and share your data."

120.     Meta, however, breached its required performance by receiving information in violation of HIPAA. Data that hospitals and health care providers did not secure required authorizations to release to Meta.

121.     In turn, Meta, acting as its previous iteration, Facebook, did not confirm that any health authorizations were garnered from its user, despite its previous contractual agreement to the contrary.

122.     Instead, Meta received the health care information, without any evidence of required patient authorizations, and used said information to send targeted ads to Facebook users, like the Plaintiffs and Class Members, in violation of contract, Terms of Service and Data Policy.

123.     In addition to the express breach, Meta violated an implied contract in that Facebook users reasonably expected Meta would not take actions that would violate the Plaintiffs' right to privacy related to their personally identifiable health information.

124.     As a direct and proximate result of Meta's breach of the contract, Plaintiffs and Class Members did not receive the benefit of the contract and were damaged as a result, in an amount to be proven at trial

<div align="center">

**SECOND CAUSE OF ACTION**

**BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

**All classes**

</div>

125.      Plaintiffs re-allege and incorporate by reference all the allegations contained above.

126.     A contract existed between Plaintiffs and Class Members and Meta when Plaintiffs clicked the box required to join Facebook, which included the Data Policy that promised user that partners were required to have lawful rights to share data.

127.     Plaintiffs substantially performed its responsibilities required by the Meta's Terms, Data Policy, and Cookies.

128.     Despite this, Meta's use of unauthorized health information deprived Plaintiffs of receiving the benefits received under the contract.

129.     By using unauthorized health care information, Defendant did not act fairly and did not act in good faith.

130.     Accordingly, Plaintiffs have been injured as a result of Facebook's breach of the covenant of good faith and fair dealing and are entitled to damages and/or restitution in an amount to be proven at trial.

<div align="center">

**THIRD CAUSE OF ACTION**

**INVASION OF PRIVACY**

**CALIFORNIA CONSTITUTION, Art. 1, § 1**

**All classes**

</div>

131.     Plaintiffs re-allege and incorporate by reference all the allegations contained above.

132.     As part of HIPAA, Plaintiffs had a specific, legally protected privacy interest in their personal health information.

133.     Meta promised, in its Data Policy, that it would require its partners to have the lawful right to collect and use data, providing Plaintiffs with a reasonable expectation to privacy on Meta platforms, specifically Facebook, in relation to the unauthorized use of their healthcare information.

134.     Meta's failure to follow its own Data Policy by using unauthorized health information constitutes a serious invasion of privacy to Plaintiffs.

135.     As a result, Plaintiffs have been damaged in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION

### INTRUSION UPON SECLUSION

**All classes**

136.     Plaintiffs re-allege and incorporate by reference all the allegations contained above.

137.     HIPAA protects people, like Plaintiffs, from having their private health care information shared on a small or wide scale basis without the patient's consent, which provides patients, like Plaintiffs, to have privacy related to his or her health care information.

138.     Meta promised users in its Data Policy that it would require its partners to have the lawful right to collect and use data, but Meta did not follow its own Data Policy, which previously lulled Plaintiffs into the belief that private information would remain private.

139.     As a result, Meta, through its use of unauthorized health information, intruded into the Plaintiffs' private matters in a manner that is highly offensive to a reasonable person.

140.     Plaintiffs have therefore been damaged in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION

### VIOLATION OF THE FEDERAL WIRETAP ACT

### 18 U.S.C. § 2511

**All classes**

141.     Plaintiffs re-allege and incorporate by reference all the allegations contained above.

142.     Through the use of the Meta Pixel, Meta (formerly Facebook) violated the Federal Wiretap Act by intentionally intercepting communications between healthcare providers and Plaintiffs.

143.     Using Meta Pixel, Meta willfully learned (or tried to learn) the contents of private conversations between Plaintiffs and their healthcare providers.

144.     This interception by Meta was intentional. Otherwise, Meta would not have encouraged healthcare providers to install Meta Pixels on their websites. Meta would not have encouraged healthcare providers to use data from Meta Pixels to create custom and lookalike audiences. Lastly, Meta did not take any actions to stop healthcare providers from transmitting patient medical information to Meta via Meta Pixels.

145.     Plaintiffs have been injured because of Meta's violations of the Federal Wiretap Act, in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION

### VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW

### CAL. BUS. & PROF. CODE § 17200, *et seq*.

### All classes

146.     Plaintiffs re-allege and incorporate by reference all the allegations contained above.

147.     This claim is pled in the alternative.

148.     California's Unfair Competition Law prohibits conduct that is unlawful, fraudulent, and/or unfair.  For the reasons set forth above, each of the prongs is satisfied here.  Meta violated existing law, Meta engaged in conduct likely to deceive a reasonable consumer, Meta's conduct violates established public policy regarding the protection of healthcare information, and the harm inflicted on consumers is not outweighed by any legitimate benefit to competition.

149.     There is no adequate remedy at law.

150.     Defendant Meta engaged in unlawful business acts when it intercepted Plaintiffs' private communications with their Healthcare providers.

151.     Plaintiffs were injured as a result of Meta's unlawful acts, which also violated the California Invasion of Privacy Act and the Federal Wiretap Act.

152.     Plaintiffs were injured as a result of Meta's unlawful and deceptive actions.

153.     Plaintiffs seek restitution for monies unlawfully obtained, injunctive relief, and any other relief allowable under the California Business & Professions Code § 17203, including, but not limited to, enjoining Defendant from continuing to engage in its unlawful conduct as alleged.

**SEVENTH CAUSE OF ACTION**

**NEGLIGENT MISREPRESENTATION**

**All classes**

154.    Plaintiffs re-allege and incorporate by reference all the allegations contained above.

155.    Meta represented to Plaintiffs that before it would receive confidential information about Plaintiffs, that it would require its "partners" to have "to have lawful rights to collect, use, and share [Plaintiffs'] data before providing any data" to Meta, formerly Facebook.

156.    Meta did not follow through with its representations and did not take steps to ensure its representations were true.

157.    Meta, however, did intend that Plaintiffs rely on the representation, as it was part of Meta's Data Policy.

158.    Plaintiffs reasonably relied on Meta's representation and as a result were injured in an amount to be proven at trial.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs, on behalf of themselves and the Class, seek the following relief:

a.   Certification of the proposed Class, designating Plaintiffs John Doe 1 and John Doe 2 as the representatives of the Class, and designating undersigned counsel as Class Counsel.

b.   Award damages, including actual damages, compensatory damages, benefit of the bargain damages, and nominal damages.

c.   Disgorgement of profits.

d.   Restitution.

e.   Punitive and Exemplary Damages.

f.   Statutory Damages, where provided by law.

g.   Attorneys' fees.

h.   Reasonable costs incurred with this action, including costs for expert witness fees and other costs as provided by law.

i.   Interest.

j.   Equitable and declaratory relief.

k.  Injunctive Relief.

l.  Any other relief available under the claims brought by Plaintiffs.

m.  Any other relief that this Court deems just and proper.

**JURY TRIAL DEMAND**

Plaintiffs hereby requests a jury trial for all issues so triable.

DATED:      October 28, 2022                     Respectfully submitted,

/s/ *Jennie Lee Anderson*_____
Jennie Lee Anderson (SBN 203586)
Lori E. Andrus (SBN 205816)
**ANDRUS ANDERSON LLP**
155 Montgomery Street, Suite 900
San Francisco, California 94104
Telephone:  415-986-1400
jennie@andrusanderson.com
lori@andrusanderson.com


W. Daniel "Dee" Miles, III (*pro hac vice to be filed*)
Alison D. Hawthorne  (*pro hac vice to be filed*)
Rachel N. Minder (*pro hac vice to be filed*)
Rebecca D. Gilliland (*pro hac vice to be filed*)
**BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, P.C.**
272 Commerce Street
Montgomery, Alabama 36104
Telephone: 334-269-2343
Dee.Miles@Beasleyallen.com
Alison.Hawthorne@beasleyallen.com
Rachel.Minder@beasleyallen.com
Rebecca.Gilliland@Beasleyallen.com


***Counsel for Plaintiffs and the Proposed Classes***